# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| UNITED STATES OF AMERICA, | ) |
| --- | --- |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 12-CR-0026-CVE |
| | ) |
| BRIAN ELBERT LEE, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Defendant Brian Elbert Lee is charged by indictment as a felon in possession of a firearm (count one), and a felon in possession of firearms and ammunition (count two). Dkt. # 2. Defendant moved to suppress the firearm in count one and the firearms and ammunition in count two (Dkt. ## 21, 22, 23), to which the government responded (Dkt. ## 27, 28, 29). An evidentiary hearing on the motions was held on September 27, 2012.

## I.

## Motion to Suppress Firearm in Count One

On December 5, 2010, an Oklahoma Department of Wildlife Conservation Supervisor, Brek Henry, (game warden) was working in Craig County. The game warden was watching that particular area because it had a high frequency of illegal hunting activity, and he had made several previous arrests for illegal hunting in the same location. At about 5:15 p.m., the game warden saw a grey Nissan van, Oklahoma tag 337-GNZ, drive down a gravel public road at a slow pace. As he approached the car in a marked vehicle, he saw deer in the field, and then he saw what appeared to be a gun barrel sticking out of the driver's side window of the stopped van. He saw a muzzle flash

from the firearm and heard a loud shot. The game warden drove toward the van and, when the van began to move, the game warden engaged his emergency lights and stopped the van.

The game warden approached the driver's side of the van and had the driver step out. He patted down the driver, later identified as the defendant. The game warden had defendant stand near the rear of the van, and then the game warden looked into the van and saw a rifle, later identified as a Marlin Firearms Company, Model 336, serial number 27044051, on the van's passenger seat. The game warden examined the rifle, and he found one spent round in the barrel and four live rounds in the magazine. He seized the rifle and placed it in his trunk. The game warden then obtained a driver's license from defendant, which identified defendant as Brian E. Lee, and the game warden issued three citations related to illegal hunting, gave defendant an evidence receipt for the rifle, and released defendant. The rifle was turned over to the Craig County Sheriff's Office.

Generally, a warrant is required prior to a search or seizure. However, the Supreme Court has outlined several exceptions that allow for warrantless searches and seizures. Under the automobile exception, "'[p]robable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains . . . evidence.'" United States v. Bernard, 680 F.3d 1206, 1210 (10th Cir. 2012) (quoting United States v. Chavez, 534 F.3d 1338, 1343-45 (10th Cir. 2008)). The Supreme Court has also established the plain view doctrine as an exception to the warrant requirement, under which there are three requirements to justify a warrantless seizure. "First, the seizing officer must not have violated the Fourth Amendment 'in arriving at the place from which the evidence could be plainly viewed.'" United States v. Naugle, 997 F.2d 819, 822 (10th Cir. 1993) (quoting Horton v. California, 496 U.S. 128, 136 (1990)). "Second, the item must not only be in plain sight, but 'its incriminating character must also be

immediately apparent.'" Id. (quoting Horton, 496 U.S. at 136) (remaining citation omitted). Third, "'not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself.'" Id. (quoting Horton, 496 U.S. at 137) (remaining citations omitted).

The game warden's search and subsequent seizure was a valid warrantless search and seizure.[1] First, the game warden was justified in stopping defendant's van. The game warden observed a rifle shot from defendant's van, which was a violation of Oklahoma law. Okla. Stat. Ann. tit. 29 § 5-203.1(D) (West 2012) (attempt to kill wildlife with aid of motor-driven conveyance). That observation gave the game warden probable cause to believe the van contained the rifle, which gave the game warden authority to search the automobile for evidence.

Second, under the plain view doctrine, the game warden also validly seized the rifle from defendant's van. As to the first element, the game warden engaged his emergency lights and initiated a stop of defendant's van only after observing a rifle shot in violation of Oklahoma law. Therefore, he did not violate the Fourth Amendment in arriving at the place where he viewed the rifle. As to the second element, the rifle's incriminating character was immediately apparent. Finally, the game warden had a lawful right of access to the rifle. Generally, this third factor is implicated in cases where an officer "on the street sees an object through the window of a house, or when officers make observations via aerial photography or long-range surveillance." Naugle, 997 F.2d at 823. In this case, however, the game warden, under the automobile exception, had probable

---

[1] Although not raised by defendant or the government, it is worth noting that a game warden has the authority to issue citations or arrest. Okla. Stat. Ann. tit. 29, § 3-201(B); see United States v. Fisher, 38 F.3d 1144, 1145 (10th Cir. 1994).

3

cause to search the van for evidence of the law violation. Therefore, the final element is also satisfied. The motion to suppress (Dkt. # 21) is denied.

## II.

## Motion to Suppress Ammunition in Count Two

Some time prior to November 16, 2011, Claremore Police Sergeant Wayne Stinnett (sergeant) received information that defendant was poaching[2] deer, had outstanding traffic warrants from Craig and Rogers Counties, and was residing with a woman at an apartment on North Missouri Avenue in Claremore, Oklahoma. The sergeant was told that defendant routinely carried a loaded firearm in his vehicle. The sergeant ran a computer check of defendant's criminal history, and he determined that defendant had a felony conviction for unlawful removal of the dead in Rogers County, Oklahoma. He also learned that defendant had an outstanding misdemeanor warrant in Rogers County for failure to pay a traffic ticket issued October 19, 2010; that defendant had an outstanding misdemeanor warrant in Craig County for failure to pay three hunting citation fines; and that defendant's Oklahoma driver's license had been suspended. The sergeant confirmed the arrest warrants were still outstanding, and obtained copies of the citations written to defendant in Craig County by the game warden for "hunting with the aid of a motor vehicle," "shooting from a public roadway," and "hunting without land owner consent." The game warden had included the notation "1-Marlin Model 336 rifle, ser# 27044051 loaded with 1 empty & 4 live rounds" on the citation for "hunting with the aid of a motor vehicle." The sergeant spoke with the game warden, and the game warden recounted the events of December 5, 2010 as they are set out above.

---

[2]   Poaching was described by the witnesses as hunting illegally.

On November 16, 2011, the sergeant conducted surveillance in an unmarked unit and saw defendant leave the Claremore apartment driving a red 2001 Ford Ranger truck. The sergeant observed a large crack across the windshield. Defendant traveled to the Claremore library with a female child in the passenger seat. The sergeant notified Claremore Police Lieutenant Richard Jones (lieutenant) of defendant's location, defendant's driver's license suspended status, and that defendant had two outstanding warrants. The sergeant also told the lieutenant that defendant's front windshield had a large crack along the critical area of the glass, and that there might be a firearm in the vehicle. The sergeant asked the lieutenant if he would initiate a traffic stop based on observations that the lieutenant would be able to make.

Defendant left the library a short time later and passed in front of the lieutenant at a "T" intersection. The lieutenant saw defendant's vehicle with the cracked windshield and initiated a traffic stop. The lieutenant confirmed that defendant's driver's license had been suspended, and he confirmed the two outstanding misdemeanor warrants. Defendant told the lieutenant that he lived at an address in Chelsea, Oklahoma. Defendant was placed under arrest for driving under suspension, and was transported to the Rogers County jail by Officer Lance Jensen. At booking, defendant said he lived at an address in Claremore, Oklahoma.

An inventory search of defendant's vehicle was completed by the lieutenant, and the lieutenant seized: five rounds of Winchester (Olin Corporation) .20 gauge shotgun shell ammunition; one round of Remington .16 gauge shotgun shell ammunition; and three spent rounds of Winchester (Olin Corporation) .22 caliber cartridge casings on the floorboard of the passenger side of the vehicle. The shells and casings were released to the sergeant, who identified the shells and casings and turned them in as evidence to the Claremore Police Department.

The traffic stop and arrest by the lieutenant on November 16, 2011 in Claremore, Oklahoma was valid and did not violate defendant's Fourth Amendment rights. A traffic stop is a seizure, and does implicate a person's Fourth Amendment rights. Whren v. United States, 517 U.S. 806, 809 (1996); Berkemer v. McCarty, 468 U.S. 420, 436-37 (1984). However, a traffic stop is characterized as an investigative detention rather than a custodial arrest. Berkemer, 468 U.S. at 436-37; United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) (citation omitted). Further, a traffic stop, while it is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances . . . is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 810 (citations omitted). Additionally, the reasonablness of a traffic stop does not "depend[ ] on the motivations of the individual officers involved." Id. at 813. Where a traffic stop is "based on an observed traffic violation . . . [or] if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring," the traffic stop is valid. Hunnicutt, 135 F.3d at 1348 (citation omitted); United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995). In other words, the court's "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." Id. at 787 (quotation marks omitted). "This is purely an objective assessment; the officer's subjective motivations for the stop are irrelevant." United States v. Bryant, 100 Fed.Appx. 788, 790 (10th Cir. 2004) (citing Botero-Ospina, 71 F.3d at 787). Further, the officer need not be correct in his suspicion, but need only have a reasonable suspicion of a violation. United States v. Callarman, 273 F.3d 1284, 1287 (10th Cir. 2001).

In a routine traffic stop based upon an observed traffic violation, as long as the detention is temporary, lasts no longer than necessary to effectuate the purpose of the stop, and the scope of the detention is tailored to the underlying justification, the stop is reasonable. United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997); see Terry v. Ohio, 392 U.S. 1, 18-20 (1968). "During a traffic stop . . . a police officer is permitted to ask such questions, examine such documentation, and run such computer verifications as necessary to determine that the driver has a valid license and is entitled to operate the vehicle." Wood, 106 F.3d at 945 (citing United States v. Miller, 84 F.3d 1244 (10th Cir. 1996)). "In appropriate circumstances, to ensure the officer's safety, the officer may obtain information regarding the detainee's criminal history." Id. (citing United States v. McRae, 81 F.3d 1528, 1536 n.6 (10th Cir. 1996)). Therefore, "[t]o determine the reasonableness of an investigative detention, [courts] make a dual inquiry, asking first 'whether the officer's action was justified at its inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" Hunnicutt, 135 F.3d at 1348 (quoting Terry, 392 U.S. at 20).

Defendant argued at the evidentiary hearing that the testimony was that there was one crack in the windshield, which would not be a violation of Oklahoma law and would not have given the lieutenant reasonable suspicion that defendant violated any applicable traffic or equipment regulations. Oklahoma law mandates that "[n]o person shall operate any motor vehicle which . . . has two or more stress or hairline cracks, twelve (12) inches or more in combined length, located in the critical area." Okla. Stat. Ann. tit. 47, § 12-404(B)(2) (West 2012). The statute also prohibits operation of a vehicle with other types of windshield damage. The lieutenant testified that he could not remember if there was one crack in the windshield or if there were several cracks emanating

7

from the main windshield crack. He further testified, however, that he could see the crack in the windshield as the defendant drove across a "T" intersection in front of the lieutenant's patrol car, and the lieutenant described the windshield as cracked across the critical area and having a large crack. Further, the sergeant testified that the crack in defendant's windshield appeared to go completely across the windshield. The Court finds that the windshield crack, as described by the officers, did not fit neatly into any statutory category of windshield damage. The Court further finds that, upon seeing a wide or large crack that appeared to traverse the windshield, or at least large enough to observe as the defendant drove across the intersection in front of the lieutenant, the lieutenant had a reasonable suspicion that defendant's vehicle violated the Oklahoma highway safety code sufficient to make a traffic stop. See Bryant, 100 Fed.Appx. at 798 (officer who testified a defendant's windows "appeared to be 'too dark,' and that [the officer] believed that the light transmittance test would be 'awful close'" had reasonable articulable suspicion to make traffic stop); see also Callarman, 273 F.3d at 1287 (finding it was "irrelevant whether the observed crack [in the windshield] was, in fact, large enough to constitute a violation of the law" in determining whether officer had reasonable suspicion to make a traffic stop). The traffic stop was not improper.

Once the lieutenant stopped defendant's vehicle, the lieutenant was further justified in determining the status of defendant's driver's license. Once the lieutenant determined that defendant's license had been suspended, he was authorized to arrest defendant. See Okla. Stat. Ann. tit. 47, § 16-114 (West 2012). Once the lieutenant arrested defendant, the police were entitled to conduct an inventory search of defendant's vehicle. See Colorado v. Bertine, 479 U.S. 367, 371 (1987) (in absence of "showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation," inventory search was valid).

8

"[I]nventory searches are [ ] a well-defined exception to the warrant requirement of the Fourth Amendment." Id. (citations omitted); United States v. Haro-Salcedo, 107 F.3d 769, 772 (10th Cir. 1997). An inventory search is valid where it is (1) "conducted according to standardized procedures," Haro-Salcedo, 107 F.3d at 772, and (2) not "investigatory in nature but must instead be used only as a tool to record the defendant's belongings," United States v. Edwards, 242 F.3d 928, 938 (10th Cir. 2001). "An inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence, but rather an administrative procedure designed to produce an inventory." Haro-Salcedo, 107 F.3d at 772-73.

The lieutenant performed a valid inventory search, which was consistent with the written policy of the Claremore police department. In his inventory of defendant's vehicle, he found the ammunition charged in count two. The motion to suppress (Dkt. # 22) is denied.

### III.

### Motion to Suppress Firearms in Count Two

On November 16, 2011, the sergeant obtained a search warrant for defendant's residence in Claremore, Oklahoma to search for .12 gauge ammunition and weapons manufactured to fire .12 gauge ammunition,[3] as well as .22 caliber ammunition and weapons manufactured to fire .22 ammunition. Dkt. # 23, at 11. The affidavit in support of the search warrant recited that, on November 16, 2011, the lieutenant initiated a traffic stop on defendant's vehicle and "placed the defendant under arrest for driving under suspension;" further, during the traffic stop, defendant told

---

[3] The government's response in opposition to this motion to suppress states that the .12 gauge ammunition was a typographical error and should have read .20 gauge ammunition.

9

the lieutenant that he lived at an address in Chelsea, Oklahoma with his girlfriend, Ann Kelley.[4] Id. Although the lieutenant testified at the evidentiary hearing that he did not remember whether defendant said that he lived with his girlfriend, the sergeant testified that the statement in the search warrant affidavit–that defendant told the lieutenant that he did live with her–came from the lieutenant on that day. The affidavit further stated that Ann Kelley's address was verified through City of Claremore utilities as an apartment at 832C North Missouri Avenue in Claremore, Oklahoma, and that the sergeant had previous knowledge of defendant's criminal history, which was confirmed by a computer check that showed defendant had a felony conviction in Idaho for issue/draw check without funds in 2003, and that defendant had a felony conviction from Rogers County, Oklahoma for unlawful removal of the dead in 2007. Finally, the affidavit stated that, during the inventory of defendant's vehicle, six .20 gauge shotgun shells and three "spent .22 caliber cartridges" were recovered from the passenger-side floorboard and, based on the sergeant's experience, he knew that individuals that own firearms maintain them as valuable property for long periods of time and store them in their residence. Id.

Claremore Police Investigators Chuck Goad, Keith Heskett, and Shane Reynolds (investigators) and the sergeant executed the search warrant, on November 16, 2011, at the North Missouri Avenue residence. The sergeant met with Ann Kelley, told her that he had a search warrant, and asked her assistance in gaining entry. Ms. Kelley produced the apartment key and opened the door for the investigators and the sergeant. The sergeant gave Ms. Kelley a copy of the search warrant and told her that they were searching for ammunition and weapons that would fire

---

[4] Some documents spell Ann Kelley's name as Kelly while other spell it Kelley. See Dkt. ## 23, 28.

that ammunition. Ms. Kelley walked to a closet in the living room and told the investigators and the sergeant that there were three weapons in the closet. The sergeant saw three rifles propped against the door frame inside the closet, and he photographed the three rifles prior to seizing them. The sergeant recovered: one Marlin Firearms Company, model 336, 35 Remington caliber rifle, serial number 27044051; one Winchester, model 94, 30-30 caliber rifle, serial number 4302143; and one Savage Arms, model Springfield model 187J, .22LR caliber rifle, un-serialized. Ms. Kelley also produced from her purse one .380 caliber Bersa, semi-automatic handgun, serial number B29481 with a corresponding Uncle Mike's holster, and she told the sergeant she purchased that particular weapon prior to defendant moving into her apartment and showed the sergeant her concealed carry permit. Ms. Kelley also informed the sergeant that the defendant began staying with her in the apartment in October 2011, and that he brought the rifles to the residence shortly after he began staying there.

Defendant asserts that the search warrant for the North Missouri Avenue residence lacks probable cause because it contained information gathered through the search and seizure of defendant's vehicle on November 16, 2011. Defendant argues that the search warrant was obtained by officers by virtue of information learned by officers during the November 16, 2011 traffic stop, including: the "seizure of a handful of shotgun shells;" the fact that defendant "was a convicted felon;" and the fact that defendant "stated that he lived in the home of his girlfriend, Ann Kelly."

However, the earlier search and seizure was valid. The rounds and casings discovered in defendant's vehicle were seized as part of a valid inventory search, which was validly executed. The lieutenant was also authorized to "obtain information regarding the detainee's criminal history." Wood, 106 F.3d at 945 (citing McRae, 81 F.3d at 1536 n.6). Further, the statement regarding his

11

residence was also not a violation of defendant's rights. Where a "request for identification was 'reasonably related in scope to the circumstances which justified' the stop," and "[t]he officer's request was a commonsense inquiry, not an effort to obtain an arrest . . . after a *Terry* stop yielded insufficient evidence," the request for identification "did not contravene the guarantees of the Fourth Amendment." Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cnty., 542 U.S. 177, 189 (2004). Further, questions about a person's name and address are generally not subject to Miranda protections. United States v. Lara-Garcia, 478 F.3d 1231, 1235 n.3 (10th Cir. 2007); United States v. McCurdy, 40 F.3d 1111, 1115 (10th Cir. 1994) ("'[d]isclosure of name and address is essentially a neutral act,' and 'it would be the 'extravagant' extension of the privilege . . . to hold that it is testimonial in the Fifth Amendment sense.'" (quoting California v. Byers, 402 U.S. 424, 431-32 (1971) (alterations in McCurdy))).

The search warrant contains sufficient probable cause. Probable cause is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 214 (1983). And, the inquiry is whether, under the totality of the circumstances, probable cause is established. Id. at 267. Further, an affidavit in support of a search warrant must contain facts sufficient to "lead a prudent person to believe that a search of the described premises would uncover contraband or evidence of a crime." United States v. Rowland, 145 F.3d 1194, 1204 (10th Cir. 1998).

The affidavit supporting the search warrant for defendant's residence set out facts sufficient to lead a prudent person to believe defendant's residence would contain contraband, including: "defendant advised [the lieutenant] that he lived with his girlfriend, Ann Kelly, but provided [the lieutenant] with an address in Chelsea, Rogers County, Oklahoma" when Ann Kelly's residence is

12

in Claremore, Oklahoma; the sergeant, as the affiant, had previous knowledge of defendant's criminal activity and ran a computer check that uncovered previous felony convictions; multiple shotgun shells and spent cartridges were recovered from the passenger side floorboard during an inventory of defendant's vehicle; and, in the sergeant's experience, "individuals that own firearms maintain them as valuable property for long periods of time and store them in their residence." Dkt. # 23, at 11-12. The search warrant did not contain "tainted information" and thus contained sufficient probable cause.

Although defendant does not raise the issue in his motions to suppress, the misidentification of .12 gauge rather than .20 gauge shells in the search warrant does not cause the warrant to be insufficiently particular. "[A] warrant's description of things to be seized is sufficiently particular if it allows the searcher to reasonably ascertain and identify the things authorized to be seized." United States v. Finnigin, 113 F.3d 1182, 1187 (10th Cir. 1997) (quotations and citations omitted). "[T]he warrant must leave nothing to the officer's discretion as to what is to be seized, so that the officer is prevented from generally rummaging through a person's belongings." United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997) (citation omitted). Where a warrant set out ten categories of records or books to be seized, including categories like "any and all records relating to the business . . ." and "telephone records, bills, and invoices," the Tenth Circuit found the warrant "'allow[ed] the executing officers to distinguish between items that may and may not be seized.'" Id. at 1363 (quoting Finnigin, 113 F.3d at 1187). Further, where a "warrant did not describe the items to be seized at all," it was facially invalid. Groh v. Ramirez, 540 U.S. 551, 558 (2004) ("warrant did not simply omit a few items from a list of many to be seized, or misdescribe a few of several items") (alterations in original).

The warrant described the property to be seized as ".12 gauge ammunition and weapons manufactured to fire .12 gauge ammunition, as well as .22 caliber ammunition and weapons manufactured to fire .22 caliber ammunition." Dkt. # 23, at 13. That language does not justify a fishing expedition or allow officers to generally rummage through defendant's belongings. Instead, it sufficiently and particularly sets out the things to be seized. The minor error does not invalidate the search warrant.

Finally, defendant argues that the "good faith exception," which was established in United States v. Leon, 468 U.S. 897 (1984), is inapplicable, and that the exclusionary rule is the appropriate remedy. Dkt. # 23, at 6, 8. However, even assuming, arguendo, that the warrant did lack sufficient probable cause, the good faith exception should apply and the exclusionary rule should not. Generally, there is a presumption that "when an officer relies upon a warrant, the officer is acting in good faith." United States v. Cardall, 773 F.2d 1128, 1133 (10th Cir. 1985); United States v. Harrison, 566 F.3d 1254, 1256 (10th Cir. 2009). "It is only when reliance [on the warrant] was wholly unwarranted that good faith is absent." Cardall, 773 F.2d at 1133. However, where an officer "knows or should have known that a search warrant was invalid," that officer "may not rely upon the good faith exception to immunize his subsequent seizure of evidence." Harrison, 566 F.3d at 1256 (citing Leon, 468 U.S. at 919). Because the purpose of excluding evidence is to "deter unlawful police conduct," evidence "should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Leon, 468 U.S. at 919 (quoting United States v. Peltier, 422 U.S. 531, 542 (1975)).

The Supreme Court has determined that there are situations where the good faith exception should not apply. These include instances where a magistrate judge was misled by the affiant and the affiant knew or should have known the information was false; "where the issuing magistrate wholly abandoned his judicial role" so that "no reasonably well trained officer should rely on the warrant;" where a "warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;'" or where a "warrant [is] so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923 (citations and quotations omitted). Where an affidavit does not establish probable cause, suppression is not warranted if the officers relied in good faith on a duly authorized search warrant, subject to the exceptions outlined above. United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2011).

The sergeant, as the affiant, cannot be said to have had knowledge that the search violated the Fourth Amendment. Instead, the sergeant set forth the fact that defendant gave an incorrect address, had outstanding warrants, and that an inventory search led to the discovery of multiple shotgun shells and spent cartridges. Once the magistrate determined there was probable cause to search defendant's residence from the information the sergeant provided, the sergeant was entitled to rely on that determination. The motion to suppress firearms in count two (Dkt. # 23) is denied.

**IT IS THEREFORE ORDERED** that defendant's motions to suppress (Dkt. ## 21, 22, 23) are **denied.**

**DATED** this 28th day of September, 2012.

*[signature]*
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE